CANNADY'S USED CARS, Etc. *v.* DOWLING.

May 24, 1954

No. 39170          66 Adv. S. 1          72 So. 2d 696

*Rushing & Guice,* Biloxi, for appellant.

T. J. *White*, Gulfport, for appellee.

Hall, J.

W. R. Cannady is the owner of a retail automobile business at Meridian, Mississippi, where he resides. It is operated under the name of Cannady Motor Co. He also owns a retail used car lot at Biloxi, Mississippi, a distance of approximately 165 miles from where he lives and from where his principal business is conducted. On December 23, 1952, appellee went to the used car lot in Biloxi, which is operated under the name of "Cannady's Used Cars" and which has a sign so reading over the entrance to the used car lot. At the lot there is a small office building. Upon driving into the lot appellee found that only one person was there, viz., Leslie Danks, who was apparently in full charge and who was trying to sell automobiles to any person who came upon the lot. Appellee was driving a Nash automobile, owned by him, and he stated to Danks that he desired to trade it in on a Pontiac car. He inquired whether Danks had authority to make a deal and Danks

assured him that he did. While the authority of an agent may not be proven by unsworn statements of the agent made out of court, this evidence was admitted without objection. Danks and appellee agreed on a deal whereby appellee was to take the Pontiac at a price of $2,395.00, from which was deducted a credit of $695.00 as an allowance for his equity in the Nash and also a credit of $100.00 then paid, leaving a balance of $1,600.00 plus carrying charges, etc., to be liquidated over a period of 21 months at the rate of $98.55 per month. Danks had a key to the office and there he prepared papers for conclusion of the deal, among which was a conditional sale contract which was executed by appellee and by Danks as agent for appellant. Appellee moved some of his personal belongings from the Nash and placed them in the Pontiac, delivered the Nash and the keys thereto to Danks, obtained the keys to the Pontiac and drove back to his place of business in Biloxi.

Later in the day Mrs. Catherine Snell telephoned appellee and told him that the deal was not satisfactory and requested him to return the Pontiac and get his Nash car and his cash deposit. Appellee advised her that he considered he had made a deal and declined to comply with Mrs. Snell's request. On January 5, 1953, W. R. Cannady wrote appellee from Meridian and advised that he could not accept the deal and returned his $100.00 deposit. About the same time Danks drove the Nash car to appellee's place of business, parked it in front, and went in and offered appellee the keys to the Nash, which appellee declined to accept. Danks placed the keys on the counter and walked out, and the Biloxi police later removed the Nash from the street and stored it. Shortly afterward Cannady filed a replevin suit to recover possession of the Pontiac. On the trial of the replevin suit judgment on a jury verdict was rendered in favor of appellee. Hence this appeal.

The issue was submitted to the jury upon the question of the apparent authority of Danks to make a deal such as is here involved and the trial court refused a peremptory instruction requested by Cannady and also refused instructions to the effect that Dowling must prove that Danks had the actual authority to make the deal. It appears from the evidence that Danks had been on this used car lot for only one or two days. There were ordinarily at least two employees on the lot with the actual authority to trade cars. One was Mrs. Snell who testified that she was the bookkeeper and had authority to approve any deal that was made and to assign conditional sale contracts and notes to the finance company. The other was a man named Crabtree who, according to her testimony, had authority to make and close deals. She said that Crabtree telephoned her the previous day and advised that he was going to Meridian and that he was placing Danks on the lot. A fair conclusion from her testimony is that both she and Crabtree were general agents for Cannady. She did not testify what authority Crabtree delegated to Danks. Danks was not on the payroll as a salaried employee. Neither Crabtree nor Danks nor Cannady testified. When the deal in question was made Mrs. Snell had gone to Gulfport and was not in Biloxi. Upon her return she discovered that Danks had sold the Pontiac below its selling price and she refused to approve the deal. Danks remained on the lot until some time in February 1953, but, according to Mrs. Snell, he did not make any more sales, but merely washed cars and checked up on them. Dowling regularly made the $98.55 monthly payments as they became due, but these payments were all mailed back to him. At the trial he tendered these payments to appellant as well as a return of the $100.00 down payment which had been mailed back to him, and this tender was refused by appellant's attorneys. He was not in default at any time in any of his obligations under the conditional sale contract.

██ ██ For reversal appellant relies primarily on two cases, viz., Eaton v. Hattiesburg Auto Sales Co., 151 Miss. 211, 117 So. 534, and Lee v. Dixie Motor Sales Co., 155 Miss. 393, 124 So. 487. The Eaton case was decided in 1928 and the Lee case in 1929. Both held in accordance with the general rule that an agent with authority to sell personal property does not have authority to trade for other property but only to accept cash in the sale. In the Lee case the Court quoted from the Eaton case and said "* * * a salesman's authority to sell automobiles for the owner does not confer on him authority to exchange them for other automobiles, in the absence of proof of special authority so to do or a general custom or usage from which such special authority can be inferred." Those cases were decided before the days of the used car lot as it is operated today. ██ ██ Such lots are so numerous and common throughout the state that we must take judicial notice of the fact that a large per cent of the deals made on such lots today are not for cash but involve trade-ins and time payments. We would not be inclined to hold that any employee on such a lot has the apparent authority to close a deal where there is someone else present and in charge. But in this case it is undisputed that the owner of the lot lived probably 160 to 170 miles from this lot and operated his main business elsewhere. On this occasion his agent in charge of the lot was not there but had placed Danks in charge, and the agent in charge of the office was not there but was in Gulfport. Danks had been furnished a key to the office and was the only agent on the lot. Apparently he had the authority to sell automobiles either for cash or on time and to accept trade-ins on the deals which he made. ██ ██ To hold that appellee should have first ascertained who owned the lot and then get in touch with the owner to inquire as to the extent of Danks' authority is wholly unreasonable. Danks had been vested with the apparent authority to make such deals. The fact that

he was not carried on the payroll as an employee is a strong circumstance to show that he was working for a commission on the sales which he made. He was there for considerably more than a month. ▮▮ It is our conclusion that Danks had been vested with the apparent authority to make the deal here in question and that his principal is bound by his acts. ▮▮ Hence the case was properly submitted to the jury on this issue of apparent authority. Our conclusion is supported by respectable authority.

In the case of Allen v. T. J. Moss Tie Co., 157 Miss. 392, 402, 128 So. 351, this Court said: "Of course, it is familiar learning that a person dealing with an agent must know at his peril the extent of the agent's authority to bind his principal; but where the principal has placed the agent in a position where he appears with reasonable certainty to be acting for the principal and his acts are within the apparent scope of his authority his acts will bind the principal."

In 2 C. J. S., Agency, Section 96b, pages 1208-1211, it is said:

"Despite its not being a part of 'actual' authority, in the technical sense in which that expression is used, as to third persons dealing with the agent in good faith without notice or knowledge of private instructions or of the limited scope of the actual authority, the agent's apparent powers are his real powers.

"Those in the position described may rely upon the agent's apparent authority, and act upon the assumption that his mandate embraces the power ostensibly possessed by him.

"The field of power within which the agent's acts or statements will operate to create obligations against the principal in favor of such persons or affect his relation or status with reference to them is not confined to the authority actually bestowed upon the agent, but extends, in the absence of countervailing notice or knowledge, to embrace whatever comes within the scope of

his apparent or ostensible authority, which is the governing consideration, even as to those particulars wherein the semblance of authority departs from and exceeds that actually given him, and regardless of limitations as between principal and agent, where loss would otherwise result to one acting in good faith reliance on such apparent authority.

"Whenever the principal, by statements or conduct, places the agent in a position where he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such a position, and thereby justifies those dealing with the agent in believing that he is acting within his mandate, an apparent authority results which replaces that actually conferred as the basis for determining rights and liabilities. The measure of authority consists of those powers which the principal has thus caused or permitted the agent to seem to possess, whether the agent had actual authority being immaterial if his conduct was within the apparent scope of his powers; the question involved is no longer what authority was actually given or was intended by the parties to the agency agreement, but resolves itself instead into the determination of what powers persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe him to have on the basis of the principal's conduct. Absence of intention to confer any power of the character of that exercised cannot be asserted so as to avoid or vitiate the authority, for the agent's authority as to those with whom he deals is what it reasonably appears to be."

There is another reason why the peremptory instruction requested by appellant was properly refused. We have already pointed out herein that appellee testified that Danks assured appellee that he had authority to make the deal. There was no objection to this evidence. In the case of Citizens Bank of Hattiesburg v. Miller, 194 Miss. 557, 565-566, 11 So. 2d 457, this Court quoted

with approval from 20 Am. Jur. 1036, as follows: "The fact that evidence which is introduced in a case may be, if objected to, incompetent evidence under some one or more exclusionary rules of evidence does not destroy its probative effect, if it is admitted without objection. It is the generally prevailing rule that relevant evidence received without objection may properly be considered, although it would have been excluded if objection had been made. Such evidence, where admitted without objection, has the force and effect of proper evidence and is to be accorded its natural probative effect as though it were admissible under the established rules of practice." To the same effect see Fox v. Baggett, 101 Miss. 519, 58 So. 481, and Griffith's Mississippi Chancery Practice, Section 579, and the numerous authorities cited in the notes under that section.

Affirmed.

*McGehee, C. J.,* and *Lee, Kyle* and *Holmes, JJ.,* concur.