200 So.2d 672 (1967)
Tam EBERT, Plaintiff-Appellant,
v.
G. D. BABIN d/b/a Babin Motors, Defendant-Appellee.
No. 2053.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1967.
*673 Garrett & Ryland by B. Dexter Ryland, Alexandria, for plaintiff-appellant.
Smith, Taliafero & Griffing, by George Griffing, Jonesville, for defendant-appellee.
Before FRUGE, TATE and HOOD, JJ.
HOOD, Judge.
This is an action for damages based on allegations that the defendant unlawfully seized and repossessed a new automobile which plaintiff had purchased from defendant. Defendant contends that the automobile had not been sold to plaintiff and that plaintiff was not the owner of the car at the time it was repossessed. Judgment on the merits was rendered by the trial court rejecting plaintiff's demands, and plaintiff has appealed.
The principal issue presented is whether a sale of the automobile from defendant to *674 plaintiff had been consummated prior to the time it was repossessed.
At the time the alleged illegal conversion occurred, defendant, G. D. Babin, d/b/a Babin Motors, was engaged in the business of selling new and used automobiles in Jonesville, Louisiana. On November 3, 1965, plaintiff, Tam Ebert, who lives in Forest Hill, Louisiana, went to defendant's place of business in Jonesville to view the display of automobiles in that establishment. While there, plaintiff entered into negotiations with Robert L. Swayze, a salesman employed by defendant, relative to the purchase of a new car. The negotiations resulted in an agreement between plaintiff and Swayze for the purchase of a new Ford automobile, the parties having agreed on the car, the price, the incidental charges, the financing terms and the trade-in value of plaintiff's old Chevrolet automobile. It was understood, however, that defendant was to investigate plaintiff's credit rating, and that the completion of the sale was conditioned on defendant's later approval of plaintiff as a credit risk.
To assist defendant in making this credit investigation, plaintiff was requested by Swayze to furnish certain information as to his employment, income and debts on a written form designated as a "Customer's Statement," and in compliance with this request such a form was completed and signed by plaintiff. In that statement plaintiff declared that he was employed by "Louisiana Pavement, T. L. James." After furnishing this statement, plaintiff left defendant's place of business with the understanding that he was to check with Swayze later to determine whether the sale could be completed.
Plaintiff testified that late in the afternoon of that day, as he was driving by defendant's place of business, he was flagged down by Swayze and was told that Louisiana Pavement, T. L. James, would not confirm the fact that plaintiff was still an employee of that company. Plaintiff thereupon informed Swayze that he had been offered and would accept employment by Jimmy Thompson of Alexandria, and that Swayze could insert the name of Jimmy Thompson on the Customer's Statement in lieu of the employer originally named. Mr. Babin testified that this information was not given to Swayze until the next morning. In any event, after this information was conveyed to him, Swayze added the name of Jimmy Thompson Enterprises to the Customer's Statement as the employer of plaintiff.
On the morning of November 4, 1965, plaintiff telephoned Swayze as he had been requested to do, and he was informed by Swayze to the effect that the sale had been approved and that he could pick up the automobile that morning. Upon receiving this information, plaintiff drove from his home to Jonesville, accompanied by his family, for the purpose of completing the purchase of the new automobile.
Upon his arrival in defendant's place of business, plaintiff went into a private office with Swayze, and while there plaintiff signed the following documents:
1. A "Statement of Retail Automobile Transaction;"
2. A printed form of an Application for Certificate of Title and Passenger Car Registration;
3. A printed form of a promissory note; and
4. A printed form of a chattel mortgage.
The first mentioned document, the Statement of Retail Automobile Transaction, was completely filled in at the time it was signed. All three of the other listed documents, however, were printed forms and the blank spaces on those forms had not been filled in when plaintiff signed them. Although these last mentioned documents were not complete when plaintiff signed them, all of the figures and information necessary to complete them were contained in the Statement of Retail Automobile Transaction which plaintiff had signed, and *675 we assume that if the sale had been approved by defendant he would have filled in the blanks on the signed documents, using the figures shown on the above mentioned statement.
In addition to signing the above mentioned documents, plaintiff paid to Swayze the sum of $110.08 in cash, and he gave him a check for $30.00. Plaintiff also gave the salesman the "pink slip" to his old Chevrolet automobile which was being traded in. He explained that the pink slip was transferred because he did not have the Certificate of Title in his possession. The cash, check and old automobile constituted the total down payment of $591.83 which had been agreed upon as the required down payment for the purchase of the new car. Swayze, in behalf of defendant, issued a receipt to plaintiff for the $110.08 cash payment which had been made.
In purchasing this new automobile it was understood that it was to be equipped with a radio. Defendant did not have a radio in stock at that time, so it was agreed that plaintiff could bring the car back after defendant received a stock of radios and one would be installed in the car without charge. Swayze furnished plaintiff with a document, designated as a shop order, which authorized the installation of a radio in this car. On this shop order Swayze wrote, "New car sold to Ebert."
After these documents were signed, and as plaintiff was leaving Swayze's office, he met W. O. Poole, another automobile salesman employed by defendant. Plaintiff had talked to Poole earlier, and Poole was aware of the fact that plaintiff had been discussing the purchase of an automobile with Swayze. Plaintiff told Poole that he had bought the car, and he asked Poole to assist him in moving his personal belongings from his old car to the newly purchased automobile. Poole assisted plaintiff in moving his belongings into the new car, and Poole then filled the new automobile with gasoline. After this had been done, and as plaintiff was about to leave in the new car, Mr. Swayze brought out a booklet entitled "Registered Owner's Manual," which purports to contain instructions for the care and maintenance of the automobile, and he gave this booklet to plaintiff.
On the inside front cover of the Registered Owner's Manual which was handed to plaintiff there is a form which, when filled out, purports to show the name and address of the owner of the automobile, a complete description of the car, the warranty number, and the name of the dealer with whom the ownership or warranty has been registered. This form had been completely filled out by typewriter before the manual was handed to plaintiff, and it listed plaintiff's name as the owner of the car, with plaintiff's address, a full description of the automobile, and a statement that the car or warranty was registered with the dealer, Babin Motors. At the bottom of the form, in a space designated for the signature of the dealer, there is a signature which purports to be that of G. D. Babin. When Swayze handed this manual to plaintiff he suggested that plaintiff sign it in order that the warranty would be effective, and pursuant to that suggestion plaintiff signed the warranty certificate at the place indicated for the owner's signature. He then put the Owner's Manual, containing the signed warranty certificate, in the glove compartment of the new car and he drove away from defendant's place of business.
Mr. Babin denied that he signed the certificate on the inside cover of the Registered Owner's Manual, but he concedes that it "probably was signed by one of the salesman or somebody." He stated, "Well it's possible that some of the employees could have signed it because after all you don't have to have my signature on the warranty book." He also explained that he usually waits "until the credit is approved" before the name and address of the purchaser is typed in the certificate on the Owner's Manual, but that "a salesman, if he didn't know what he was doing, he might go in the office and fix up this warranty if *676 he didn't know * * * that I hadn't finished * * *"
Plaintiff left defendant's place of business in the new automobile some time before the noon hour on November 4. He drove to Alexandria with his family, where he showed the new car to his father and sister. While in Alexandria he transported his sister back to work after lunch in the car, and then drove to Forest Hill, Louisiana, where he showed the automobile to friends in that community. Later that afternoon he and his family drove the car to his home.
A few minutes after plaintiff left defendant's place of business in the new car shortly before noon, defendant received a report from the Rapides Credit Bureau which indicated that plaintiff's credit rating was unsatisfactory, and Mr. Babin thereupon informed Swayze that the sale could not be made to plaintiff. Babin was then told that plaintiff had already driven away in the new automobile, and he thereupon instructed Swayze to get in plaintiff's old automobile, to overtake plaintiff, to inform him that the sale could not be made and repossess the new car. Swayze was delayed in leaving, and he did not succeed in contacting plaintiff until almost dark that evening, at which time he drove up to plaintiff's home and found him there.
Plaintiff testified that when Swayze drove up to his home shortly before dark in the old car, he explained to plaintiff that he "had to have" the new automobile, and he stated that he was about to have a heart attack. Plaintiff surrendered the automobile to Swayze, and the latter returned to plaintiff the $110.08 in cash which had been paid, the $30.00 check given by plaintiff, the old Chevrolet automobile which plaintiff was to trade in on the new car, and all of the papers which plaintiff had signed or delivered to defendant earlier that day in connection with the purchase of the car. The next morning plaintiff consulted an attorney, and thereafter this suit for damages for wrongful conversion was instituted.
Swayze, the salesman who conducted practically all of the negotiations with plaintiff, died about one month before the case was tried, and his testimony thus was not available at the trial.
Plaintiff contends that the sale of the car was complete when he left defendant's establishment before noon on November 4. He further contends that the seizure or repossession of the car was illegal, and that it has caused him to suffer damage to his credit rating, humiliation, physical discomfort and inconvenience, for all of which he is entitled to recover damages. Defendant, as we have already noted, denies that a sale of the car was ever consummated.
Applicable here are Articles 2439 and 2456 of the Louisiana Civil Code, which articles read as follows:
"Art. 2439. The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
"Three circumstances concur to the perfection of the contract, to wit: the thing sold, the price and the consent."

"Art. 2456. The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid." (Emphasis added.)
Defendant concedes that there has been an agreement as to the "thing sold" and as to the "price." He contends, however, that he has never given his "consent" to the sale, and thus the sale was never complete because one of the essential elements of such a transactionthe consentis lacking.
Mr. Babin testified that he was the sole proprietor of Babin Motors, and that he is the only person in the establishment who has authority to complete the sale of a car. He stated that the procedure customarily *677 employed in completing a sale is for the salesman to have the prospective purchaser sign a buyer's statement, a contract and an application for the license. These papers are then taken to the office and a credit investigation is made while the salesman holds the customer. The sale is accepted or rejected by defendant after he obtains the information requested from the credit source. If the sale is accepted, then Babin signs the contract and delivers it to the purchaser, and that completes the sale. Babin testified that in this instance, he was in the process of making a credit investigation of Ebert when plaintiff drove off in the car, that he had not completed the investigation and had not signed the contract, and that the sale thus had not been completed when plaintiff left. The credit information which defendant had requested was received by him about five minutes after plaintiff drove off, and the report was such that Babin considered it unsatisfactory and he would not complete the sale.
W. O. Poole, one of defendant's salesmen, testified that a salesman in defendant's establishment had authority to make a straight sale of a car without Babin's approval, although they normally obtained his prior approval anyway, but that they were required to get defendant's approval before a credit sale of an automobile could be made "if it is possible." He also testified, as did Mr. Babin, that normally a Registered Owner's Manual is not filled out and given to the customer until after the sale of the automobile has been completed. And he stated that when Mr. Babin was not in the place of business "one or two" could sign Babin's name on the Owner's Manual but "normally they always wait until he comes back."
We think the evidence shows that it was the practice in defendant's place of business that salesmen ordinarily would obtain authority from Mr. Babin before the sale of an automobile on credit would be completed. The evidence also shows, however, that plaintiff was informed by Mr. Swayze on the morning of November 4 that the sale of the automobile involved here had been approved by defendant and would be completed if plaintiff went to Jonesville for that purpose. We, unfortunately, do not have the benefit of Mr. Swayze's testimony. Plaintiff testified, however, that on the morning of November 4 Mr. Swayze informed him by telephone that "everything was fixed up and squared away," that "the deal had went through and been approved, that I could come get my car," and that "the car was ready for delivery, to come and get it." We think Swayze meant by those statements to tell plaintiff that defendant had consented to sell the car to plaintiff under the terms which had been agreed upon and that the sale would be completed if plaintiff would come to Jonesville for that purpose. The events which transpired thereafter confirm the fact that, at least as between Swayze and plaintiff, there had been a complete meeting of the minds or a consent to the sale. Upon plaintiff's arrival at defendant's place of business, and at Swayze's suggestion, plaintiff signed a promissory note and a chattel mortgage, he paid a sum of money in cash and another sum by check, and he turned over to Swayze the only indication of title to the trade-in car which he had. Swayze issued to plaintiff a receipt for the cash payment, a shop order for the installation of a radio in the new car with the notation "New car sold to Ebert,"and either he or some other employee of defendant had a certificate of warranty filled out showing that plaintiff was the owner of this particular car. In addition to all of these things the car was delivered to plaintiff, filled with gas, plaintiff was furnished with the warranty certificate and he was permitted to drive the car from defendant's place of business to his home, thinking that he had purchased a new car. We think none of these things would have been done if Swayze, at least, had not been under the firm impression that there had been a consent to the sale. And, the fact that these events did transpire supports plaintiff's testimony to the effect *678 that Swayze advised him to the effect that the defendant had consented to the sale.
Mr. Babin obviously was in the vicinity and was aware of the fact that plaintiff was negotiating with Swayze. He stated that he saw plaintiff "when he was out there looking at that car, and I was in the office," that he had received a "Customer's Statement" and other documents signed by plaintiff on November 3, and that he had been investigating plaintiff's credit since that time. We find no testimony in the record to the effect that either Mr. Babin or Mr. Swayze asked plaintiff to wait or that they instructed anyone to delay him until the credit report could be obtained. The evidence shows that Mr. Swayze was aware of the fact that plaintiff was about to leave in the new car and he felt that there was no need to detain him, because Swayze rushed out and handed the Owner's Manual to plaintiff just as he was about to drive away in order that plaintiff would have it with him when he left. If Mr. Babin had intended for the sale to be held up until he completed his credit investigation, it seems to us that he would have let Mr. Swayze know that, since the latter was handling the sale for him.
LSA-C.C. art. 1811 provides that "the assent to a contract may be express or implied," and that it is implied "when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances be supposed to mean * * * an assent." See also LSA-C.C. arts. 1816-1818.
We think the evidence shows that defendant Babin was aware of the negotiations between Swayze and plaintiff, and that he at least tacitly approved the sale. We conclude, therefore, that defendant consented to the sale and that the sale was complete at the time the car was delivered to plaintiff by one of defendant's employees.
Even if it should be determined that Mr. Babin did not tacitly approve or consent to the sale, the evidence shows that Swayze did consent to it, and we think defendant is bound by that consent because he clothed his salesman, Swayze, with the apparent power to act for him in making such a sale. Plaintiff dealt with Swayze in good faith, relying on the latter's apparent authority to complete the sale of an automobile, and under those circumstances defendant is estopped from denying the agency or authority.
Where the principal clothes an agent with apparent authority to perform certain acts, and a third person who has no knowledge of or reason to believe that there are limitations on that authority deals with the agent, then the principal is estopped from setting aside the acts of the agent which are within his apparent authority, although beyond the actual power delegated to him. See LSA-C.C. art. 3000; Goldman v. Greater Louisiana Corporation, 126 So.2d 771 (La.App.4th Cir. 1961); James v. Judice, 140 So.2d 169 (La.App.3d Cir.1962); International Union of Operating Engineers, Hoisting, & Portable Local 406 v. Guy Scroggins, Inc., 168 So.2d 724 (La.App.3d Cir. 1964, Writ Refused); Fidelity Credit Company v. Bradford, 177 So. 2d 635 (La.App.3d Cir. 1965); Morton v. American Employers Insurance Company, 104 So.2d 189 (La.App.2d Cir. 1958); General Finance Company of Louisiana v. Veith, 177 So. 71 (La.App.Orl. Cir. 1937).
In James v. Judice, supra, we held that the owner of a car who vests a used car dealer with apparent authority to sell it is bound by the sale of the car by that dealer, even though the latter exceeds the actual authority which was given to him by the owner. In that case we said:
"* * * the jurisprudence has been established to the effect that a principal who clothes his agent with the apparent power to act for him may be estopped under some circumstances from setting aside the acts of the agent which are within his apparent authority, although beyond the actual powers delegated to him." *679 And, in Goldman v. Greater Louisiana Corporation, supra, our brothers of the Fourth Circuit Court of Appeal, stated:
"Where one, by acts or conduct, has knowingly caused or permitted another to act within the latter's apparent authority as his agent to the injury of third persons who themselves have acted in good faith and with reasonable prudence, he is estopped from denying the agency or the authority."
Generally, the authority of an agent who engages in the sale of movables is impliedly limited to making sales for cash, and the power conferred upon the agent to sell movables ordinarily does not carry with it the authority to exchange the property to be sold for other property or to make credit sales. However, where credit sales and exchanges are customary in a business or trade, particularly if that custom and usage is well known to the purchaser, such sales and exchanges generally will be upheld on the basis of the agent's apparent authority. 3 Am.Jur.2d Agency, Secs. 102 and 104; 44 A.L.R.2d 1065-1067; Cannady's Used Cars v. Dowling, 221 Miss. 293, 72 So.2d 696 (Miss.), 44 A.L.R.2d 1053.
We think we can take judicial notice of the fact that the sale of automobiles by a retail dealer of new and used cars involves a substantial number of credit sales and the exchange or trade-in of older cars. See Cannady's Used Cars v. Dowling, supra; McCormick on Evidence, Sec. 324, p. 689. Since the sale of cars on credit and the exchange of older cars as trade-ins is a customary practice in that particular business, we think an automobile salesman, employed by such a dealer and held out to the public as being such a salesman, has the apparent or ostensible authority to negotiate and complete the sale of an automobile in behalf of the dealer, even though it involves a credit sale and the trade-in of another car. In the absence of any facts or circumstances which would cause the purchaser to know or have reason to believe that the regularly employed salesman for the dealer does not have that authority, we believe the credit sale of an automobile completed by such a salesman is binding on his principal, the dealer, even though the salesman was never given actual authority to make it.
In the instant suit, we think Mr. Swayze had the apparent or ostensible authority to complete the sale of a new car to plaintiff, even though it involved a trade-in and it was a credit sale, and that defendant is estopped from setting aside the acts of the agent which were within his apparent authority. This is particularly true here, where Swayze not only had the apparent authority to sell on those terms, but he also represented to plaintiff that he had received specific authority to complete this sale, and neither defendant nor anyone else gave plaintiff reason to believe otherwise.
Defendant contends further, however, that the parties contemplated that the sale would be reduced to writing and that the contract is inchoate and incomplete until the written contract has been executed. It is pointed out that in this case no written contract of sale was entered into, plaintiff did not produce the certificate of title to his old car which was to be traded in, and he did not execute any document transferring ownership of his old car to the defendant. It is noted that the form of note and chattel mortgage which plaintiff signed could not serve as a written contract because neither of those documents had been completed at the time the signature was affixed to it and defendant has never signed either of them.
We find nothing in the record which supports defendant's assertion that it was mutually agreed between the parties that the sale was to be reduced to writing. It is true that Mr. Babin testified that his regular practice in completing sales was that a "contract" would be signed by the purchaser and the seller, but in this instance plaintiff did not stipulate that the contract *680 was to be reduced to writing before it would be effective. We also are aware of the fact that the Certificate of Title Law (LSA-R.S. 32:701 et seq.) requires that there be a written assignment before the title to an automobile may be transferred. Our jurisprudence has been established to the effect, however, that the title to a motor vehicle, although imperfect, is subject to transfer in accordance with the provisions of Article 2456 of the Louisiana Civil Code, as between the parties, even in the absence of compliance with the provisions of LSA-R.S. 32:701 et seq. See James v. Judice, supra, and authorities cited thereon. It was not necessary, therefore, that a certificate of title be obtained either for the new car or for the old car which was being traded in on the new one in order for the sale of either car to be complete as between the parties.
Our conclusion is that there was no mutual agreement between the parties that the sale was to be reduced to writing and that it was not to be effective until a written contract evidencing that sale had been completed. We think the sale was complete when the automobile was delivered to plaintiff, and that plaintiff was the owner of the automobile at the time it was repossessed. In our opinion the trial court erred in concluding that the sale had not been consummated before the car was repossessed.
Defendant had no authority to repossess the automobile which was then owned by plaintiff, and he thus is liable for the damages which plaintiff sustained as a result of the unlawful conversion of that property.
The evidence fails to show that the repossession of this car has damaged plaintiff's credit rating. No suit was filed in connection with the repossession of the car, and insofar as that conversion is concerned there is nothing on the public records which could reflect on plaintiff's credit. After the repossession there were no outstanding or unpaid debts due by plaintiff as a result of this transaction, and thus there was no reason why the recovery of the automobile by defendant should affect plaintiff's credit rating.
The evidence also fails to show that plaintiff has been deprived of the use and enjoyment of an automobile at any time. His old car was returned to him when the new car was repossessed, and he thus has suffered no physical discomfort or inconvenience because of the conversion.
We think plaintiff is entitled to recover damages for the humiliation and mental anxiety which resulted from the repossession. He was in possession of the new automobile for only a portion of one day, however, and he showed it to relatively few people. We think the humiliation and mental anxiety which he suffered as a result of the repossession was minimal, and that an award of $250.00 for that item of damage would be fair and adequate.
Plaintiff also claims attorneys fees. Our jurisprudence is established to the effect that attorneys fees cannot be allowed in cases of this nature. Deboue v. Gillman, 2 So.2d 690 (La.App.Orl. Cir. 1941).
For the reasons herein assigned, the judgment appealed from is reversed and judgment is hereby rendered in favor of plaintiff, Tam Ebert, and against defendant, G. D. Babin, d/b/a Babin Motors, for the sum of $250.00, with legal interest thereon from date of judicial demand until paid, and for all costs of this suit. The costs of this appeal are assessed to defendant-appellee.
Reversed and rendered.